MOWER COUNTY HUMAN SERVICES, o/b/o Kimberly Swancutt, petitioner, Appellants,

v.

Mark A. SWANCUTT, Respondent.

No. C4–95–863.

Supreme Court of Minnesota.

July 11, 1996.

Robert W. Auron, Asst. Mower County Atty., Austin, MN, for appellants.

Lee A. Bjordnal, Baudler, Baudler, Maus & Blahnik, Austin, MN, for respondent.

## OPINION

STRINGER, Justice.

Here we are asked to determine whether a contempt order to enforce a child support order may contain a continuing purge obligation such that, to avoid jail time, the delinquent parent must meet future support obligations until the year 2009, the time when the youngest child reaches age 18. We conclude that the trial court was within its discretion to order continuing compliance with a child support order as a purging condition of a stayed contempt sentence.

Since 1988, respondent Mark A. Swancutt has provided little financial support for his three children in spite of court ordered child support obligations. In March of 1995, the trial court concluded that Swancutt showed a lack of good faith in not maintaining or obtaining gainful employment and found him in contempt of court for willful failure to pay court ordered child support. Swancutt was ordered to serve 60 days in the Mower County jail with the sentence conditionally stayed. As one of the conditions of the stayed sentence, the trial court ordered Swancutt to continue to make his court ordered monthly child support payments without limitation as to time—thus the order would presumably remain in effect, unless modified, until Swancutt's youngest child reached majority—14 years hence. On appeal, the court of appeals found this type of prospective purge condition unacceptable, concluding that contempt law requires two hearings before a contemnor may be jailed and that a contempt order must always be expressly conditioned on the right to purge in the immediate future. *Mower County Human Servs. v. Swancutt*, 539 N.W.2d 268, 271 (Minn.App.1995). We reverse.

Swancutt is the father of three children born June 15, 1984, August 14, 1987, and

April 30, 1991. He has been farming rented land since 1976 and claims to be in the process of acquiring it. Swancutt also claims that he earned a good living from the farm while married, but since his divorce the farming operation has shown consistent losses. Other than child support payments made through income withholding and revenue recapture pursuant to Minn.Stat. § 270A.10 (1994), Swancutt has paid just $175 in child support over a 7–year period.[1] The Mower County Human Services AFDC program has supported Swancutt's children.

Since the end of 1992, Swancutt has had a variety of jobs outside of farming, including work as a security guard, in a factory, as a carpenter, and in construction. In 1994, Swancutt obtained employment in a security job for Crenlo Foods at a rate of $10.63 an hour with a net monthly income of $1,393. Pursuant to a motion by Mower County Human Services on behalf of Kimberly Swancutt, the mother of the three children, for an upward modification of child support, in August 1994 an administrative law judge (ALJ) increased Swancutt's child support from $106 per month to $484 per month. At the hearing Swancutt asked the ALJ if there was a time limit on how long he had to remain in his job at Crenlo. The ALJ responded that there was no time limit, but warned him that if he left the security job "in order to avoid child support," a similar income would be imputed to him. Notwithstanding the warning, six days after the hearing Swancutt quit his Crenlo job.

At a hearing on March 14, 1995, held pursuant to a motion for contempt by Mower County Human Services on behalf of Kimberly Swancutt and a motion by Swancutt to reduce his child support obligation to $50 per month, Swancutt testified that he quit the Crenlo job to go back to farming and indicated that he expected to make a substantial income from farming in three to five years. He further testified that in the winter of 1994–95 he received training to become a crop duster to increase his agricultural income.

The trial court found that Swancutt was voluntarily unemployed because he quit his Crenlo job and refused to maintain employment off the farm despite his recent history of farm losses. Noting that he quit the Crenlo job at a time when the ALJ had ordered an increase in child support, the court found that Swancutt showed a lack of good faith in not maintaining or obtaining gainful employment. The court further found that Swancutt had child support arrearages of $11,034.74 through the date of the hearing.

The court denied Swancutt's motion to reduce his monthly child support obligation, concluded that he was in contempt of court for failure to pay the court ordered child support, and ordered judgment against him for all child support arrearages. Swancutt was also ordered to serve 60 days in the Mower County Jail.[2] Execution of the sentence was stayed, however, subject to Swancutt's compliance with the following two conditions:

(1) that he pay four months of child support arrearages ($1,936) by March 31, 1995; and

(2) that he "keep himself purged of his contempt by continuing to make his court ordered child support payments along with 20% of the court ordered payment to be payable toward arrearages."

Swancutt paid $1,936 by March 31, 1995, and thereby avoided immediate incarceration, but

---

1. From December 1, 1987, through April 30, 1993, Swancutt's court ordered child support obligation was $100 per month, from May 1, 1993, through August 31, 1994, the obligation was $106 per month, and since September 1, 1994, it has been $484 per month. From December 1, 1987, through March 23, 1995, the only child support Swancutt had paid consisted of a $125 payment in December 1987, a $50 payment in March 1993, three child support payments made through revenue recapture in 1993 and 1994, and income withholding for several months.

2. At oral argument, counsel for Mower County Human Services acknowledged that the trial court mistakenly ordered Swancutt to serve 60 days in the Mower County jail, rather than *up to* 60 days, which would entitle Swancutt to be released before 60 days upon compliance with the court ordered conditions. Accordingly, we review the trial court's order as corrected.

he contests the validity of the second element of the contempt order because the trial court's order had no expiration date and therefore was effective until his youngest child reached majority—14 years from the date of the order.

On appeal, the court of appeals concluded that holding Swancutt at risk of confinement for the next 14 years whenever he missed a monthly payment was unacceptable and reversed as to the contempt order. *Swancutt,* 539 N.W.2d at 271. The court found "this sort of prospective and rolling purge condition unacceptable" because it deprived Swancutt of his right to a first-stage contempt hearing.[3] *Id.* It further concluded that a contempt order must always be expressly conditioned on the right to purge in the immediate future. *Id.*

█ The factual findings of a contempt order are subject to reversal only if clearly erroneous. Minn. R. Civ. P. 52.01. The trial court's decision to invoke its contempt powers is subject to reversal only if the appellate court finds an abuse of discretion. *Erickson v. Erickson,* 385 N.W.2d 301, 304 (Minn. 1986).

█ Swancutt first argues that the contempt order was criminal in nature, rather than civil, and that he was denied criminal due process guarantees. The United States Supreme Court has acknowledged that the distinction between civil and criminal contempt remains "somewhat elusive," but identifying the nature of the contempt is necessary to determine the constitutional protections afforded to an individual charged with contempt. *International Union, United Mine Workers v. Bagwell,* —— U.S. ——, —— & n. 3, 114 S.Ct. 2552, 2557 & n. 3, 2559, 129 L.Ed.2d 642 (1994). We first note that the form of the proceeding indicates that it was intended as a civil matter—the Mower County Attorney initiated this proceeding on behalf of Kimberly Swancutt, a private citizen, not as the representative of Mower County in a criminal prosecution. Second, the contempt order includes a purge provision that permits

Swancutt to avoid serving the sentence by complying with the purge conditions, as distinguished from a determinate sentence in the traditional criminal proceeding. *See Hicks ex rel. Feiock v. Feiock,* 485 U.S. 624, 634, 641, 108 S.Ct. 1423, 1430, 1434, 99 L.Ed.2d 721 (1988) (concluding that a determinate sentence with a purge clause constitutes relief that is civil in nature). The contempt sanction is thus remedial rather than punitive because its purpose is to coerce compliance with the existing child support order, not to vindicate the authority of the court. *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 441, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911). Finally, historically we have classified similar contempt proceedings in support cases as civil. *Hopp v. Hopp,* 279 Minn. 170, 173, 156 N.W.2d 212, 216 (1968). In *Hopp,* we held that a contempt order in the support context was a civil proceeding, noting the "serious social problem" of the failure of spouses and parents to make court ordered support payments and the need for trial judges to be provided with the tools to enforce these obligations. *Id.* at 173, 156 N.W.2d at 216. We therefore conclude that the contempt proceedings here are civil in nature.

█ We turn next to Swancutt's argument that the trial court's order requiring future compliance with an existing court order as a purging condition was improper because his future obligations are unrelated to his past default. We find this argument disingenuous at best. For years Swancutt has flagrantly disregarded his financial obligations toward his three children and public assistance has supported his children while he has been able, but unwilling, to do so. He has terminated employment that would provide sufficient income to enable him to pay his court ordered child support. Civil contempt sanctions are intended to operate in a prospective manner and are "designed to compel future compliance with a court order," *International Union,* —— U.S. at ——, 114 S.Ct. at 2557, but they are not ordered in a vacuum. The trial court was well within its

---

3.  Swancutt also appealed the trial court's refusal to modify his child support obligation due to a change in circumstances. The court of appeals affirmed this part of the trial court's order, *Swancutt,* 539 N.W.2d at 273, and this issue is not before us.

discretion to take into account Swancutt's history of blatant dereliction of his financial obligations to his children in fashioning its remedy. Here, the trial court simply ordered Swancutt to remain in compliance with an existing child support order, one he had consistently violated, as a purging condition of the contempt order.

We are equally unmoved by Swancutt's claim that because of the prospective nature of the order, he must continue to make his support payments to avoid jail in the future. If he complies with the court order, no action will be triggered by the contempt order; if he does not comply, he is subject to the sanctions in the order. Obviously he will not be charged with violating an obligation that has yet to become due; it is only for his past conduct that the sanction is triggered. We conclude that the condition that Swancutt continue to make court ordered child support payments when due is reasonably related to the cause of the underlying contempt and is therefore an appropriate purging condition. *See, e.g., Hicks*, 485 U.S. at 649, 108 S.Ct. at 1439 (conditions that respondent comply with support order in the future and begin to pay on accumulated arrearage "aim exclusively at enforcing compliance with the existing child support order") (O'Connor, J., dissenting); *Hopp*, 279 Minn. at 172, 156 N.W.2d at 215 (henceforth paying all support when due is one of the conditions of the stayed sentence).

Swancutt next argues that the contempt order was an abuse of the trial court's discretion because it eliminates the first-stage hearing on any future events of non-payment and places him at risk of a second-stage confinement hearing whenever he misses a monthly child support payment—and he will not be free of this burden until the year 2009 when his youngest child reaches the age of majority. The court of appeals concluded that a contempt proceeding must protect the obligor's right to both a first-stage and a second-stage hearing and "must always be expressly conditioned on [the] right to purge it in the immediate future." *Swancutt*, 539 N.W.2d at 271. We do not agree that a two-stage hearing is required in every instance of failure to comply with a court ordered child support obligation.

Due process under the United States Constitution in civil contempt proceedings requires only notice and an opportunity to be heard, even though an individual's liberty may be at stake. *International Union*, — U.S. at —, 114 S.Ct. at 2557. This court has imposed additional requirements to invoke the court's civil contempt powers, however. As we stated in *Hopp v. Hopp,* a civil contempt proceeding must meet the following minimum requirements:

(1) the court has jurisdiction over the subject matter and the person;

(2) a clear definition of the acts to be performed;

(3) notice of the acts to be performed and a reasonable time within which to comply;

(4) an application by the party seeking enforcement giving specific grounds for complaint;

(5) a hearing, after due notice, to give the nonperforming party an opportunity to show compliance or the reasons for failure;

(6) a formal determination by the court of failure to comply and, if so, whether conditional confinement will aid compliance;

(7) an opportunity for the nonperforming party to show inability to comply despite a good faith effort; and

(8) the contemnor's ability to gain release through compliance or a good faith effort to comply.

279 Minn. at 174–75, 156 N.W.2d at 216–17. Our concern here then is whether the order meets the minimum requirements of *Hopp* relating to the process leading to the civil contempt order.

The court of appeals' statement that "contempt law requires two hearings before a contemnor may be jailed" misconstrues the application of the *Hopp* requirements to the facts here. *Swancutt*, 539 N.W.2d at 271. Where the trial court's procedure meets the initial phase of these *Hopp* requirements—application has been made by a party seeking enforcement setting forth specific grounds for relief, jurisdiction is determined, and the contemnor goes forth fully aware and knowledgeable about what must be done to stay out of jail and with reasonable time permit-

ted to comply—the first stage of the procedural requirements are in place. Because the trial court has determined that the contemnor has the ability to comply, the contemnor's future is wholly within the contemnor's control—in the civil contempt vernacular, the contemnor has the keys to the jail. Then, if at some later date, irrespective of how much time has passed from the initial *Hopp* hearing, the party seeking enforcement alleges non-performance, a hearing should be held, upon due notice as prescribed by *Hopp,* at which "the party charged with nonperformance [will] be given an opportunity to show compliance or his reasons for failure." *Hopp,* 279 Minn. at 174, 156 N.W.2d at 216. The court will then determine whether there has been a failure to comply and "if so, whether conditional confinement is reasonably likely to produce compliance fully or in part." *Id.* at 175, 156 N.W.2d at 217. At that point, the court may order confinement upon such terms and conditions as meet the *Hopp* requirements, including providing to the contemnor the opportunity to gain release through compliance or a good faith effort to comply. All the protective measures of *Hopp* will have been met and no additional hearing is thereafter required with respect to the then pending effort to enforce the support obligation. In summary, at the initial hearing the terms of the contempt order should be set and will stand as the obligation of the contemnor until modified or the order expires. The only concerns thereafter are matters relating to compliance which can be addressed in a single hearing.

We believe that the procedure outlined above provides the trial court with broad discretion to fashion an effective remedy to deal with those who ignore their child support obligations.

Reversed and the order of the trial court as corrected is reinstated.